Next case call for oral argument is Eastham v. Housing Authority of Jefferson County. Thank you, Your Honor. May it please the court, counsel. This is a first for me as far as judicial decisions made in the circuit court. What started out as an appeal of an unemployment benefits denial by multiple referees in the Board of Review for IDES turned into something quite different in the circuit court, which actually increases the importance of this case before you all here today. It is unique for me in that it is the first time I have ever briefed and then argued a case in the circuit court as an administrative review body where the judge made findings and ruled on arguments that were never presented to the court by opposing counsel. My esteemed colleague is not the attorney that was present in the oral argument in the circuit court. One of his colleagues were, and it was quite interesting because if you take a look at the transcript, the judge made findings that, in fact, one of the statements he made was, times they are changing. Marijuana is now legal in numerous jurisdictions, at least medical marijuana is. This particular individual was fired in 2008, long before any state in the country had a legalization of marijuana policy and even a medical marijuana policy. What difference does it make that the substance was illegal with respect to the policy as written? It makes a tremendous amount of difference. Because the policy is written identically. The policy is written so that if you are under the influence, if you come to work under the influence of marijuana or any controlled substance, then that is a violation of the workplace zero tolerance drug and alcohol free workplace policy. Okay. My point being is that the alcohol and the illegal drug sections are identical. Is that correct? That is correct. Okay. Can you then define for me what course of employment means with respect to this policy? Course of employment as it pertains to the employees met throughout their entire course of employment with the housing authority. Does that mean that he was a 14-year employee? That means that from the day he signed on, he agreed to never use, well, marijuana, which is the issue before us. Is that what your position is? It's not exactly the issue before us, and I'll explain that. That is how the circuit judge took the matter and interpreted it. But what the policy actually says is it has a definition section of what is under the influence. And that particular definition clearly states that an employee is under the influence if he reports to work with any measurable amount. But I'd like to separate, and I understand that. I understood that your argument was course of employment did not mean necessarily what I ordinarily understood was settled law, which is either at the workplace or something related to the workplace. You're saying that it begins with signing on and agreeing to the drug-free work zone. I am saying that that is how the employees perceive it. Okay. But I am not arguing, I am not putting forth that argument before the court today. I personally do not believe that. I have a long history of practicing workers' compensation defense as well. I know that these are two different and very distinct areas of law. Wait, but what is your position with respect to this? Course of employment as defined within this policy, I think the arguments were extended, not necessarily by myself, but got to that point and were propounded by the judge. Okay, but it's not defined at all in policy. So what you're saying is what did they rely on with respect to what course of employment is? Course of employment is reporting to work under the influence of any controlled substance or alcohol. Or alcohol. Okay, stop right there. He did not report to work under the influence as defined by this policy, did he? I believe he did, Your Honor. Defined by the policy says that there has to be some measurable trace of either alcohol or the illicit drug in his system when tested. There was none. There was none at the time he was tested. Right. Isn't that what the definition of under the influence is by your policy? At that point in time, yes, if he had simply, if he hadn't said anything and he was tested, he would not have been under the influence as of the time he had tested, approximately five weeks after the fact that he admitted using the controlled substance. In this particular case, he admitted that he used marijuana on two different occasions, one of them being a day and a half before he reported back to work. The shortest period of time I can find in any study at the national or any other level is that it will stay in your system, even in your urine, which is the fastest way to pass out of your system, in five days. Was this part of the evidence? This was absolutely part of the evidence. He admitted to using it. No, I'm talking about the scientific evidence that it stays in your system for whatever period of time. No, I can give you the citations for that. I'm well aware of how long marijuana actually stays in your system. What I'm trying to figure out is how the policy, as written, supports your position that he was under the influence at the time he was drug tested. He testified that he used marijuana for the second time during his vacation within a day and a half of returning to work. It would most certainly, had he been tested at that point in time. But he wasn't tested. That's my point. It says, for the purposes of this policy, under the influence means having any measurable amount of prohibited substance under this policy in any test. And then it goes on to list the test. That is correct. In this particular instance, the employee admitted and had a belief at that time that he was under the influence, meaning that he would test positive. No, I don't think he ever said he was under the influence. He had a belief that he may test positive. Well, I think then you're making a distinction between what the actual policy says with regard to under the influence and whether or not someone is exhibiting symptoms. Was that in evidence, that he was exhibiting symptoms of being impaired? No. Okay. So what if, I'm going to give you a hypothetical, what if someone goes out on a bender on a Friday night, consumes way too much alcohol. I think most of us would know that by Monday there's not going to be any alcohol in his blood. But he's ignorant of that. He goes to work and they draw blood just on a random test. And he says, look, I may come up positive for this. So does that mean he's under the influence? No. Why not? No, because there's no way he's going to test positive for alcohol two days later. Isn't that all extraneous to the policy and to what went into the decision here? No. When you testify that you used marijuana at least a day and a half before returning back to work, we're just taking the employee at his word. So the employee is saying, hey, I think I may still be under the influence as far as your policy is concerned. No, he didn't say that. He said, I may test positive. Which is under the influence according to the policy. Right. But that's a definition. He didn't say I'm under the influence, I'm impaired. He did not say that as far as I know. There is no court anywhere that has found being impaired at any particular time is a requirement for being under the influence according to a zero tolerance drug policy. Of course not. The definition is the finding of a positive drug result, which he did not have. And that's why I posed the question, if you have somebody that's ignorant of blood alcohol, if they show up on Monday and say, oh, my gosh, I just took a random test, I think I may come out positive. Does that mean that they're under the influence? And you said no. But what you're doing is you're extrapolating from scientific literature what you know or what you believe to know, which was never in evidence, never before anybody, what you think a drug test would have showed at some other point in time. Well, let me read to you, I think it is in evidence. Let me read to you what referee Warren Lohr stated in the record. And he clearly states, although somewhat unique, the facts of this case still indicate the claimant knowingly violated his employer's drug-free workplace policy. And had he been tested shortly after his admitted drug use, he would have tested positive for drug use. Accordingly, the referee concludes that the claimant was discharged for misconduct connected with his work and is subject to a disqualification from benefits under Section 602A of the Act. But isn't that what I just said, that the referee had determined that by what he understands of drug testing and how long it stays in your system, he's determining if he had been tested sometime earlier that he would have come back positive. Yes. But he wasn't tested any time before. That's the whole idea of random drug testing, is it not? It is, but I believe when you have an employee that admits drug use shortly before returning back to work for employment, that that is a clear violation. There are also, if the Court would indulge me a moment, there's a case that I believe is very much on point in this particular case, and it is a Colorado case, which is very interesting. Have you cited it? It is not in there. I was able to obtain this much later. Why don't you file a motion to us, and we'll give counsel an opportunity to respond. Very good. I would be happy to. And I think your time has expired. Thank you. Thank you very much. Counsel? May it please the Court, Timothy McPike, Assistant Attorney General, on behalf of the Board of Review of the Department of Employment Security. If I may answer Bronner's question in regard to what the Board of Review found, the policy is stated on A7 of our appendix in our appellant's brief. And as we argued in our brief, you will see that not only is under the influence a violation of policy, but also manufacture, distribution, dispensing, possession, which a drug test would not, you know, if you possess marijuana, you're not going to test positive on a drug test, or consumption. Any one of those was a violation. But on housing authority premises or in the course of employment. Or in the course of employment. So we go back to what that means. In the course of employment, I believe Mr. Eastman has argued that we should look to a case that he cited, which was a workers' compensation case. Yeah, but I didn't see any case that you cited. We don't cite any case because under the, this is the employer's policy. How the employer interprets his policy is what determines whether his work related. The court's duty is to say, this is how they interpret their policy, is the way that they interpret their own policy reasonably related to the employment. And it's not the court's job to interpret the meaning of their policy. That's their job. It's their policy. If they interpreted in the course of employment to mean only when you're on premises or when you're on call, then it would be a different case. But that isn't how they interpreted the policy. If you read Mr. Upchurch's testimony and the union representative's, I don't think it was his testimony, it was both Mr. Upchurch's testimony and Mr. Eastman's testimony about what the union representative said. This is also a union policy. Right. They're identical, too. Yes. We both interpreted, both the union rep and Mr. Upchurch, both the employer and the union, interpret that policy as meaning any time, day or night, as long as you're employed. So that means that the consumption, possession, distribution of alcohol is also a violation of the policy. I don't have that. It's identical wording. It's an identical wording. Yes. I think the answer there is they interpret their, I mean, based on the facts. So the course of employment is interpreted differently for alcohol. And how would anybody know that? Well, I think it relates to, as we argue in our reply brief, common sense is it harms the employer more if there are two identical behaviors, drinking alcohol, smoking marijuana. One is illegal. The other isn't. You're a public housing authority. You have a duty under federal law to keep your place drug free. By the fact that you're engaging in illegal behavior, you're associating with other people who are manufacturing and distributing illegal substances. And you've got an employee who's associating with those people who continues in that course of conduct even after he's been arrested. And he's also associating with your employees. The court can take judicial notice of the problems of public housing. As I argue in my reply brief, if this were a restaurant or a gas station, it would be an arguably different case. But here, the specific duty of a public housing authority to provide a drug free environment means that having an employee who associates with people who engage in distributing and selling marijuana presents a very specific potential harm that is not speculative. Well, I think that, and I'm not disagreeing with what you're saying as a public policy or reputation of the housing authority. But that seems to be going very far afield of this policy as I read it. And quite honestly, my concern is I see absolutely no difference in alcohol and marijuana as far as the way it's defined and treated. And I don't think anybody with a straight face could say that the day you sign on to this, you agree to this, that you're agreeing to never consume alcohol. You're absolutely correct, Your Honor. And I think the fact that the one substance is illegal is the linchpin for that. And again, to emphasize that it is how the employer interprets and applies his policy that the court looks to. Without disagreeing with anything you said, it's clear from the testimony that they interpret their policy and enforce their policy for illegal drug use differently than they interpret it for legal alcohol use. And that's just common sense. I have one more question, then I'll let you finish. I know I've been very succinct with my questioning. If somebody were on leave, say six months leave for whatever reason, and the housing authority found out that they had used marijuana, would they terminate them? Could they terminate them under this policy? Well, I'd have to speculate as to how the housing authority would interpret being on leave. I assume if they interpreted it as being within the course of employment, that they would terminate them. I thought everything was in the course of employment. Vacation, weekends, holidays. We know from the record, and again, I think perhaps you can ask this question of a housing authority's counsel. I can only speculate. All I know is what was before the Board of Review, and that was that they interpreted being on vacation as in the course of employment. Whether extended leave, they would interpret it that way. If they did interpret it as being within the course of employment, yeah, they'd fire them. I think that, again, what the policy intends is that the harm to specifically a public housing authority as opposed to a restaurant or a nightclub. And the harm being to its reputation. To the workplace, to have a person who's actively associating with people who are in the business of manufacturing and distributing illegal drugs. But we've gone pretty far afield now. Now you're actually talking about his character and his associates when he's not at work, period. Well, yeah. Yes, I am. And that's specifically, I think, pragmatically, if you look at the reason for the policy, it's that. You're prohibited from possessing, consuming, or being under influence. And it's a zero tolerance policy. And how they're interpreting that is you don't engage in illegal drug use at all. On the housing authority premises. Or in the course of employment. Or in the course of employment. How they've interpreted that by firing Mr. Easton is while you're working for us, you do not violate the law on illegal drugs. We don't want you associating with people that sell illegal drugs. We don't want you using illegal drugs. And we don't want you near our tenants when you're doing that. When you've got those associations. I mean, this is not speculation. This is the real world in common sense of public housing and drugs. And it's maybe, you know, our thinking about this is changing as states are legalizing this. But in Illinois, under federal law, it was illegal at the time. And the illegality of it is a factor that is reasonably related to the housing authority's interpretation as to the distinction between alcohol and marijuana. And if there are no further questions. I don't think there are, counsel. Thank you much. And we would ask you to affirm the decision of the board. Counsel. Good morning, Your Honors. Good morning. Good morning. Ed Anderson for Mr. Easton. May I please have the floor? Counsels. Your Honors, the housing authority work rules were unreasonable. And they were unreasonably applied to Mr. Easton. That's what the circuit court found. And its decision that the hearing board, the hearing officer and the board of abuse findings were clearly erroneous are correct. Mr. Easton was discharged because when faced with taking a hair sample test drugs, he told his supervisor that he believed he would test positive for marijuana use. Based on that, he was taken through a discharge hearing and let go from his job. Turned out the test came back negative. I'm not going to concede that Mr. Easton ever consumed marijuana. If the housing authority is using a test, we have to assume that test is accurate. If the test is inaccurate, then it's wholly unreasonable for anyone's appointment to turn on whether or not the test shows a negative or a positive. If the test is reliable, Mr. Easton didn't consume marijuana and there's no basis for his discharge. Excuse me? You're saying that he didn't use marijuana? I think and what I argue in my brief is he believes he used marijuana, but we don't know what he puffed. But we know that when he was tested, it came back negative. If the hair test, which my understanding shows results over a long period of time, shows a negative result, then apparently he didn't use marijuana. I don't understand why you need to go there. Well, I don't think I need to, but my point is we have a test that's negative. If we're going to rely on that test, it's negative. He didn't use drugs and there's no basis for his discharge. Not just because he's not under the influence according to the definition of the policy. Well, he's certainly not under the influence when he's tested and as we discussed already, he wasn't under the influence when he arrived at work after his vacation. The circuit court's decision is essentially that the policy of the housing authority is unreasonable and unreasonably applied. And as we've kind of parsed out here, a lot of this turns on what course of employment means. Under Illinois law, which is the law a judge has to rely on, not the whatever suits the fancy of the employer as how he defines job requirements. The course of employment means within the period of employment, in reasonable performance of duties, while fulfilling his duties or in some relation to those duties, and not any time. To suggest that a judge should defer to an employer's viewpoint of what reasonable employment as any time or whatever employer sets up makes it completely arbitrary in the hands of the employer. And a judge would be left to defer to any fanciful definition of employment activity that the employer wanted to put forth, no matter how harsh. What we know in this case is that Mr. Easton was on vacation. He wasn't on call. He wasn't acting with his employment when he was on a deer cam vacation and believes he took a couple puffs of marijuana over a couple of days. So faced with this, the circuit judge found that the discharge wasn't reasonable because the drug test could show a positive result long after there was use when a person wasn't under the influence when he reported to work when he was tested. In addition, the judge based his decision in part on the finding that, in fact, marijuana use isn't always criminal everywhere. It wasn't criminal everywhere in every circumstance in 2008. It certainly isn't now. Additionally, it's unreasonable because the drug-free, alcohol-free policy is unequally applied, and the court has put some focus on that today. The policy purports to cover alcohol and cannabis, and the language is the same, but alcohol, as was testified to, is not as stringently enforced. I believe the record indicates that tenants would not be subject to removal for use of alcohol, and I believe the record indicates that the view of the housing authority was that they wouldn't know if a tenant was using drugs unless the tenant was arrested. Excuse me. Do you see any difference in the definition of course of employment as used in this contract versus the definition that Illinois courts use in the workers' compensation arena? Very much so. You think there's a big difference? Yes, Your Honor. As I said, course of employment is understood in Illinois law and what we cite. The course of employment under workers' comp is when an injury, of course, occurs during the period of employment at a place where the employee can reasonably be expected to be in, the performance of his duties, and while he is performing those duties for something incidental thereto. It seems that if that definition of the comp law that has evolved supports your argument that you have to be doing something related to employment, do you agree or disagree? Absolutely agree. That's one of the essential points that the judge relied on, is that it's unreasonable to say that a person on vacation who, as Judge Chapman pointed out, consumed alcohol and shows up to work a couple days later would be discharged or consumes a de minimis amount of marijuana, would be discharged when in fact they're not impaired. Well, it seems odd to me that had he fallen down the mountain on whatever vacation he was on, they would probably deny a workers' compensation claim. Well, that's an interesting point. Saying he wasn't in the course of his employment. He certainly would have the argument that he's not in a work-related position. He was on call, in fact. I suppose, you know, theoretically, if he was on call and was unable to show up to do something significant. Okay, but we're not talking about that. We're not there. I'm just trying to get a feel for the course of employment. I think what we have to start with, too, is to understand that the whole purpose of unemployment law is to provide a benefit to the unemployed. And in that context, we start with the presumption that we're going to liberally construe the law to provide benefits. In this case, we had a pretty constricted reading of the law to the favor of the employer. I know that Mr. Belani, in his argument for the housing authority, talked about Judge Lohr's, Referee Lohr's decision in its view of the facts that were before him. I'd like to point out that Mr. Lohr's decision is not the one that the Board of Review acted on. That was the second hearing officer, Referee Albright. It's our contention that the circuit court's decision is correct because denial of benefits is okay if the employee violates a reasonable work rule or a policy that is related to work. If the violation is deliberate, if the violation harmed the employer or was repealed despite there having been a warrant. In this instance, the judge found, first and foremost, the policy is not reasonable and not reasonably applied. And that's the end point there. But, of course, the judge went on. Our contention is that it's certainly clear that there's no violation of the law where the test was negative. Moreover, the violation, if there were one, didn't harm the employer. Mr. Easton was not on the job when he allegedly consumed marijuana. He was in a private situation. So any punitive harm to the employer is completely speculative. So based on that, I think it's pretty easy to see that the judge was well-grounded in his finding that the Board of Review and the hearing officer's findings were clearly erroneous. And that the housing authority's policy, as such, is unreasonable. I have a little bit of time, so I'd like to address some of the cases that are cited by the appellees. The housing authority cites the McAllister case, which has a more broad definition of being on the job. And we distinguish McAllister. McAllister involved a, I believe, a CTA bus driver who had an accident with his bus and was drug tested. And found to be positive for cocaine. Claimed that his cocaine use had occurred prior to his going on the shift. And so his use was vital. And in that instance, it was found that the cocaine use was still a reasonable reason for his discharge. McAllister, I think, is obviously distinguishable from this case. The bus driver was in a safety-sensitive job where, under federal law, there were very stringent requirements as to his not having cocaine in the system. The amount that was found in the system was well beyond the level that would suffice for his being discharged. And in this instance, as we know, the test of Mr. Easton showed no marijuana. And, of course, Mr. Easton is a maintenance employee, not someone in a safety-sensitive position. The board also talks about McAllister in their brief. And, again, suggests that McAllister's rules are more restrictive. The housing authority's rules are more restrictive than McAllister. Reading the idea that under the influence is any amount of substance. As we know, as I've said before, Easton had no substance in his system. And, more to the point, we get back to the reasonableness of the application of this policy where supposedly any amount of marijuana in the system would be dischargeable, but it's not at all clear that any amount of alcohol or reported alcohol use would result in discharge. The Board of Review also selects a case I believe is pronounced Checkas, that shows an off-duty conduct by an employer has some nexus with an employer's interest and could be grounds for discharge. That case, too, is distinguishable because, in that instance, since the employee worked for a Catholic church and school, the employer had a policy that the employee did not agree with, wanted to protest and complain about, and the employer took a dim view of that and said, if you're working for us, you can't be out speaking against our policies. And she was discharged. Checkas is distinguishable simply because, in that instance, it was found that she was open for benefits, even though the court agreed there was a nexus between her actions and the employee, the employer's policies, that alone is not a sufficient basis to deny benefits. The Board also cites a couple of cases, Livingston and Broddy, about the potential harm to the employer. It can be sufficient if the harm is an actual of its potential, that if you can theorize that an employee's actions might be of some harm to the employer, that's a sufficient reason to find a valid discharge that would deny benefits. to the employee. But, again, Livingston and Broddy are very distinct in that the Livingston case involved a nursing home employee who battered a resident of the home and was discharged. It was theorized that it would be harmful to the employer to have an employee who was harming residents, that that could open into suits, could harm the, how the community viewed the employers as a place to put their old folks, and that potential harm was enough to justify the discharge. In the Broddy case, it involved a factory worker using a very dangerous piece of equipment in the factory who disregarded the rules of safety about using that equipment and did it openly to the point where other employees could see that he was not following specified rules. He was discharged because he, I believe, repeatedly ignored being told to follow the correct procedures. Was that under a collective bargaining agreement? Was that done under the auspices of a collective bargaining agreement? I really don't know if that was a unionized factory or not. I know that there were work rules, and he chose to ignore them, and it was theorized that it would be dangerous because other employees might begin to ignore those rules, too. Again, those were open things that happened on the job that could redound to the detriment of the employer. In this instance, the distinction is Mr. Easton's actions were in private, away from work, and simply would be unknown, and as the courts noted, he, when tested, was not under the influence. One thing I've noted in passing is that throughout this, there's been a lot of reliance on the zero tolerance policy that the federal government places on the housing authority. But there's simply nothing in the record that shows how that zero tolerance policy is applied if, in fact, a housing authority will always lose funding, might lose funding, what risk they run if they keep an employee who may run afoul of whatever policy they put up for use of substances or alcohol. It's our contention, again, that the board review was clearly wrong in this decision. The firm of the hearing referee, the circuit judge, was correct in finding that the policy was unreasonable and unacceptably applied. We'd ask the support to affirm the circuit court's decision and award the unemployment benefits. Thank you. What would you like to respond? I would like to start by simply pointing out what the housing- Just one moment. I'm going to stand during your rebuttal. I'm recovering from some surgery, so it's easier for me to stand. I apologize. That's quite all right. Thank you. I believe it's very relevant to point out what the housing authority policy is with regard to its tenants and how that policy also relates to its employees. Under HUD regulations, and I believe this has been argued in both briefs and argued in the circuit court as well, tenants will receive an eviction and will no longer be eligible for any federal-assisted housing if they are found to possess, consume, or are even charged with using an illegal substance. Alcohol is not an illegal substance, but marijuana under federal law is, and the federal government does enforce that particular law. The zero-tolerance policy is important. There was some argument made by counsel that this particular employee is not in a safety-sensitive position. There was testimony before the hearing officer. It's contained within the record. The director testified, hey, wait a minute, this employee, he drives trucks to and from various work sites. He works with augers and large pieces of power equipment, pressure washers, services electrical appliances, is in a tenant's home while they are present. So to say that it is not a safety-sensitive position, I think, is disingenuous. And the McAllister case, I believe, is on point simply because it talks about a potential harm being just as viable as an actual harm. That was one of the arguments made in the case. I don't understand that. I'm sorry. The McAllister case says that the basis for the decision was that the presence of the illegal drug in the plaintiff's system while on duty was a violation of the CTA's policy and constituted harm to the employee unit. And that the court was in error when it also said that you had to show impairment and that there was a connection between the injury. But there was no finding of impairment, I mean, undue influence there. Unless you take the employee's word as truth. As truth. If he said that he did the marijuana, and again, you're talking with cocaine, you're talking about metabolites, and you've explained to me that you understand what those are and how they work. I just understand generally that there is a period of time. No personal experience. No personal experience, but I think anybody that's had any exposure to drugs and alcohol knows that there's a period that relates to various drugs. But my point is, how in the world does McAllister support your position when the whole case centered around the fact that this driver was found with cocaine in his system and that was the holding of the case? That it doesn't matter whether or not you can show that it related to the accident or it impaired the worker. He did not believe he was impaired. The employee in this particular case made an admission and stated that is why. That he might test positive. He believed he would test positive and admitted to using marijuana within a day and a half of returning to work. And I think that any claim by counsel that he may have not actually been using marijuana is very disingenuous because- I'll agree with you there. He made the statement, well, I couldn't beat the test. That's why I said something. I knew I couldn't beat this particular test. And he also responded to the IDES question, what act was it that caused your termination? He stated, well, not using drugs while employed by the housing. So this is an employee who makes a conscious disregard of what the employer's requirements and policies are, both under their policies and procedures and their collective bargaining agreement. And to say that it is not causing an employer harm when he says, yeah, I knew I was using drugs. I couldn't beat the test. And all of the other employees are aware of that and, oh, this guy gets to keep his job. Does that not-is that not a harm also to the employer? Because it gets out with the tenants. They become aware of it. Other employees become aware of it. And it's-where do you stop? Where do you draw that line? We're just simply saying, hey, we believe this employee. We fired him just before the results of the drug test came back, but based on his own admission that he believed he was under the influence as defined by the employer's policy. And I think that is what is crucial when taking a look at this case. I still don't understand how you get him in the course of employment. Everything you said about the harm and everything, you know, he needs to be dealt with because he said he would test positive. Really, this guy just opened his mouth too soon. Really. You would have never known about it. Well, we didn't know about it. We didn't know that he used marijuana within a day and a half of returning to work. And we knew that he would have certainly tested positive with any test that you gave him at that point in time. He was jeopardizing his fellow employees. He was jeopardizing the tenants of the housing authority. How do you go from vacation to course of employment? That's the real question. That question is answered in the Callister. If the metabolites are there, you can't tell. If the metabolites are there. And they weren't there. They may have been, and that was found by the hearing officer. And that's exactly right. The only objective part of this case is the test. Is that correct? That is correct. Thank you, counsel. We appreciate the briefs and arguments of counsel. We'll take the case up for advisement. The court is adjourned. All rise.